DAVID DWARES, *d.b.a.* DWARES & COMPANY *vs.* CLIFTON YARN MILLS, INC.

NOVEMBER 26, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.  This is an action of assumpsit, in which the declaration is in three counts.  The first is based on an alleged contract by which, in consideration that the plaintiff agreed to buy from the defendant a certain large quantity of plain and novelty yarns at certain prices, the defendant

agreed to sell and ship them to the plaintiff at those prices and also agreed that they would be of like goodness and quality with certain samples thereof shown by the defendant to the plaintiff and would be mostly in lots of 100 pounds or over of the same size and color and that the yarns would be salable merchandise and would not be moth-eaten.

The breach alleged is that the yarns contained in the first shipment by the defendant to the plaintiff, on April 15, 1937, and paid for by the plaintiff in accordance with the contract, "were not of like goodness and quality with the respective samples aforesaid" but were all of greatly inferior goodness and quality to such samples and "were not mostly in lots of 100 pounds or more of the same size and weight and were badly damaged and unsalable, and were moth eaten."

The second count of the declaration is very similar, except that the breach is alleged, in similar language, as to the second shipment by the defendant to the plaintiff on May 6, 1937. The so-called third count consists simply of the usual *indebitatus* assumpsit money counts and a so-called "account stated", which at the trial was not proved by any evidence.

The general issue was pleaded by the defendant to each of the first two counts of the declaration. No pleading of any kind was filed by the defendant to the third count. But the case was treated by both parties as if a plea of the general issue had been filed to that count also, and we shall treat it in the same way.

The case was tried before a justice of the superior court without a jury and his decision was for the defendant. It is now before us on the plaintiff's bill of exceptions. The principal exception now relied on by the plaintiff is the first, to this decision for the defendant. Of the other sixteen exceptions stated in the bill, all of which are to rulings on the admission of testimony, the plaintiff has not insisted upon exceptions 4, 16, and 17, and they will be treated as having been waived.

The following facts are established by undisputed evidence. In March 1937 the defendant corporation was and for many years had been engaged in the business of manufacturing and selling yarns, with a mill at Clifton Heights, Pennsylvania, near Philadelphia. It had accumulated a large quantity of "class 3" yarns, otherwise known as "waste yarns", consisting of unsold odds and ends. These were stored in an old towel mill building, a short distance away from the yarn mill. They were contained in boxes and weighed between 35,000 and 50,000 pounds. The contents of the respective boxes varied greatly in weight.

The plaintiff was engaged in this state in the business of selling waste yarns and similar merchandise and on March 15, 1937 he came to the defendant's office in its mill to see about buying its waste yarns. Its vice-president, Martin Sandler, who was in charge there, conferred in his office with the plaintiff and there showed the latter some samples of these waste yarns. The plaintiff then went to the old towel mill with an employee of the defendant and had as many of the boxes opened as he wished, eight to ten selected by him at random, and examined their contents. He then returned to the defendant's office, and he and Sandler, who was acting for the defendant, entered into an agreement for the sale by the defendant and the purchase by the plaintiff of all the waste yarns in the towel mill at the price of 17½ cents per pound.

In a memorandum of the agreement, sent by the defendant on March 22, 1937 and received by the plaintiff, the terms of the sale were described as "Net Cash F. O. B. Clifton Heights"; and the subject-matter and price were set forth as follows: "Miscellaneous novelty yarns, twists and raw yarns as per samples shown Mr. Dwares on Monday, March 15th. These yarns are in skeins on tubes, cones and spools. There will be only a few spools. All empty spools returnable within 3 to 4 months. Net weight about 25,000 lbs. Price .17½. Amount 4,375.00."

The other terms of the memorandum were stated as follows: "Shipments will start in about a week and continue for 3 or 4 weeks. Yarns purchased by you 'as is' 'no guarantee'. Delivery via motor truck, you to specify trucking company. The above quantity to be adjusted either upwards or downwards upon completion of delivery."

In a letter dated the next day the plaintiff told Sandler that he had received this invoice and had understood that "there would be between 35,000 and 50,000 lbs of yarn." He added, later on, "I know I am buying the yarn as is, in small lots and big lots, on cones, bottle bobbins and some spools, or as your boy stated, probably 200-300 spools, but I do not want a load of yarn on spools."

In a letter dated April 5 and received by the plaintiff a day or two later, the defendant notified the plaintiff that the first twenty-seven cases, containing 5405 lbs 15 oz. of yarn of the contract value of $945.86, were ready for shipment and it inclosed lists of the contents of the cases. In a letter of April 7 from the plaintiff to the defendant, he referred to these lists and called attention to the fact that they showed very many small lots of yarns. He suggested to the defendant that bigger lots be sent and that they "get together" on the small lots up to five pounds. He inclosed a check for the $945.86.

On April 10, 1937, the first shipment arrived; and on April 13 the plaintiff and Sandler met at the defendant's mill and agreed that the contract should be so modified that the lots of yarns under ten pounds would not be segregated and would be billed at 12c per pound, net weight, net cash before delivery; that the lots of ten pounds or over would be billed separately at 20c per pound, net cash before delivery; and that the plaintiff would "keep $1500.00 ahead" at all times until the matter was completed. These modifications were confirmed in a letter from the defendant to the plaintiff dated April 13.

On April 15 the plaintiff sent a letter to the defendant inclosing his check for $1500, as requested by the defendant. On May 6 the defendant sent to the plaintiff a second shipment of the waste yarns, as set forth in the first paragraph of a letter of that date to the plaintiff, as follows:

"Attached are invoices covering the shipment going forward to you today via Merchants & Miners. There are 54 cases and 1 carton, making 55 pieces in all. All of them contain surplus yarns, sold to you as arranged at 12c per lb. for the 'A' lots (under 10 lbs.) and 20c per lb. for the 'B' lots (10 lbs. and over), all without guarantee and no warranty of any kind, f. o. b. Clifton Heights."

In this letter the defendant also said: "Please send us another check for $1000/1500.00." On May 10 the plaintiff sent to the defendant a check for $1000, inclosed in a letter of that date.

On May 14, the plaintiff sent a letter to the defendant acknowledging the receipt of this shipment and making complaints about much of the yarn therein, that some of it was dirty; that some was moth-eaten and unsalable; and that small lots of it weighing less than ten pounds each of the same style number but of different colors were grouped together to make a combined lot weighing more than ten pounds and billed at 20c per pound. He said that he was looking forward to the large lots of the same size and color; that he was returning a part of the shipment to show why he was complaining and that he was willing to pay the freight both ways and to return all of the yarn.

In a letter of May 17, Sandler replied that he had no doubt that a little of the worsted yarn shipped might be moth-eaten, but that he was convinced that the plaintiff had "considerably exaggerated the condition of the shipment"; that the large lots, of which Sandler said there were plenty, would be coming along in perhaps the third shipment; that the

plaintiff had seen the yarn before he bought it "as is—no warranty" and it had not been misrepresented in any way; but that the defendant would try to improve on the next shipment.

The plaintiff replied in a letter of May 19, renewing his complaints and stating that there was only one lot in the last shipment that was properly charged at 20c per pound and that he wanted a credit of 8c per pound on the yarn that had been billed at 20c per pound. He added: "I think I am justified in asking for this credit of 8c a lb. and if you want to ship the balance of the yarn, on the agreement you and I made, sending me good size lots, I will be glad to take same in, otherwise not."

On June 4 the plaintiff sent back about 400 pounds of the yarn on spools and sent a letter to the defendant saying that he was doing so and that this yarn was nothing but waste, which he could not use, and asking for a credit for it.

On June 7 the defendant, having ready for shipment 49 cases of the yarn that was the subject-matter of the contract, gave notice of that fact in a letter to the plaintiff in which it was stated that 13 of the cases were "(a)" lots at 12c per lb., of which the poundage was given as 1574-13 lbs. and the money value as $188.99, and that the other 36 cases were "(b)" lots at 20c per lb., of which the poundage was 5168-12 lbs. and the money value was $1033.77, making a total money value of $1222.76.

In this letter it was also stated that the plaintiff's cash balance was $1078.97 and he was asked to send by return mail a check for $143.79, to make up the rest of the $1222.76, so that delivery could be made at once, and to send a check for $1000 in advance.

In a letter of June 8 the plaintiff, replying to the defendant's letter of June 7, stated that the invoices inclosed with the defendant's letter of June 7 showed "not one good size

lot in the entire quantity" and he refused to accept the new shipment, unless the defendant would give him the credit of 8c per lb., asked for in his previous letter, and would send him the larger quantities.

In a letter of June 18, marked "Att'n. Mr. H. B. Cayne", the defendant requested the plaintiff to send his check for $143.79, as previously requested, and asked whether he was "ready to accept shipment of the surplus yarns" which were "ready to go forward", and whether he wished the defendant to continue to case the rest of the lots bought by him. The letter ended as follows: "We are quite willing to relieve you of the balance of this material, if you feel that it is not up to expectations. In fact, we have other buyers very anxious to obtain it, and therefore wish that you would let us know by return mail."

In a letter of June 21 the plaintiff stated to the defendant, in substance, that he was glad that it was relieving him of the balance of the yarn but that he was still entitled to the credit of 8c per lb. on the yarn already shipped. He also wrote as follows: "In about 20,000 lbs. shipped us there has not been one item that can be turned over for a profit. . . . All we received were moth-eaten, tangled yarns and lots of mixed colors grouped together and billed at 20c lb." At the end of the letter he requested that the defendant send him its check for the $1078.97 which it was holding and $130.18 for the yarn returned.

To this letter the defendant on June 24 replied as follows:

"We believe you have misinterpreted our letter of June 18th addressed to Mr. Cayne. We cannot release you from this purchase, covered by the enclosed invoices, altho' we offered to dispose of the balance of these odd-lots in other directions. These bills represent only the second section of the yarns you bought. There would probably have been ten or fifteen more deliveries approximating about One Thousand dollars each. How-

ever in order to avoid further misunderstandings with you, we have arranged for the sale of these yarns to other concerns."

After considering this letter and the last two preceding letters and the later letters, it is clear to us that the defendant never agreed or offered to excuse the plaintiff from receiving and paying for the yarns covered by the defendant's letter of June 7 above mentioned. The only rescission proved was that by agreement between them the contract of purchase and sale was rescinded as to the yarns which were not included in the shipments covered by the defendant's letters of April 5 and May 6, or in the 49 cases referred to in its letter of June 7 as ready for shipment.

The plaintiff continued his refusal to receive the yarns in those 49 cases; and he continued to demand that the defendant repay to him the amount of money that he had paid to it above its charges to him for its two shipments of yarns in April and May, the difference being $1078.97; and that it pay him also the above-mentioned sum of $130.18, which it had credited to him for certain yarns returned, making a total credit of $1209.15.

At the trial the plaintiff contended that under the first and second counts of his declaration he was entitled to recover substantial sums for breaches of warranty by the defendant as to the yarns included in the first and second shipments respectively; and that under the third count he was entitled to recover the above-mentioned amount of $1209.15, with interest thereon. He contended also that he was not guilty of any breach of contract in refusing to accept the yarns which the defendant on June 7, 1937 had ready for shipment to him; and that title to those yarns had not passed to him.

The principal issue that arose at the trial was whether the defendant had been guilty of a breach of warranty as to the nature and condition of the goods bought from it by the plaintiff. Involved in this issue was the question of the

meaning of the expressions "as per samples shown Mr. Dwares" and "Yarns purchased by you 'as is' 'no guarantee' ", as used in the above-mentioned invoice of March 22, 1937, stating the contract between the parties as first entered into.

The plaintiff's exceptions 5 to 15 inclusive were taken to rulings by the trial justice permitting three witnesses who were familiar with the business of buying and selling yarns to testify, against the objections of the plaintiff, as to the meaning, in that business, of the above expressions "as per samples", "as is" and "no guarantee". We are of the opinion that none of these rulings constituted prejudicial error. See 7 Wigmore, Evidence, (3d. ed.) § § 1923, 1955. 1 Williston, Sales, (2d. ed.) § 253. These exceptions are therefore overruled.

The transcript shows that the question to which the plaintiff's exception 2 was taken was addressed to Sandler, when testifying as a witness for the defendant, and it was what was the total amount charged by the defendant to the plaintiff for containers of yarn in the two invoices which had been introduced and which covered the two shipments made. Exception 3 was taken to a similar question as to the invoice of the yarns ready for shipment but never shipped. We cannot see how any prejudice could have resulted from the witness's answer to either of these questions. The exceptions are therefore overruled.

This leaves for consideration only exception 1, which is to the trial justice's final decision for the defendant. In this decision he found that on the day when the original contract was made between the parties, but before it was made, the former, in Sandler's office at the defendant's yarn mill, was shown by Sandler, and examined, some samples indicating the general nature of the waste yarns which the defendant had for sale in its old towel mill; and that the plaintiff then knew that these samples were not, in the usual sense, sam-

ples of these goods but were only samples indicating in a general way the kind of yarn that would be found in the old mill.

Evidently the view of the trial justice, which he applied in arriving at his final decision, was that the samples were not shown or examined as representing the *condition* of the waste yarns in the old mill. We are of the opinion that this view was correct and that the trial justice was right in holding, as he did in substance and effect, that no warranty of the condition of these waste yarns was shown by the description of them in the defendant's written statement to the plaintiff on March 22, 1937, as "Miscellaneous novelty yarns, twists and raw yarns as per samples shown to Mr. Dwares on Monday March 15th."

This conclusion is strongly supported by the following words a little further down in the same statement: "Yarns purchased by you 'as is' 'no guarantee' ", and by similar language in later invoices and letters.

In view of this construction of the contract between the parties, and after considering the evidence in the case as to the nature and condition of the waste yarns in the two shipments delivered and of the waste yarns made ready for shipment in May 1937, and the fact that the plaintiff had an opportunity to examine and did examine all of the waste yarns that he cared to examine, we are of the opinion that the trial justice committed no error in finding, as he did, that the plaintiff had failed to prove any breach of warranty by the defendant.

The plaintiff repeatedly complained to the defendant, and contended at the trial, that many of the larger lots of yarns which were charged to him by the defendant at the rate of 20c per pound should have been charged at the rate of only 12c per pound. The reason that he gave why they should have been charged at the lower rate was that each of these

larger lots was composed of yarns of different colors and should have been divided into smaller lots, each of which would have contained yarns of only one color and would have weighed less than ten pounds and therefore would have been chargeable at the rate of only 12c per pound.

There was a conflict in the testimony of experts familiar with the handling and sales of such waste yarns as to whether or not lots could properly be composed of yarns of different colors but otherwise similar. The trial justice was not asked to make, and did not in his final decision make, any ruling on this question. But this decision involves by implication a finding against this contention of the plaintiff; and we cannot properly say that this finding was clearly against the weight of the evidence. Therefore we cannot find that the final decision was erroneous by reason of this contention.

This disposes of the first two counts of the declaration; but it leaves for consideration the question whether, on the pertinent evidence and the law applicable thereto, the plaintiff was entitled to a decision on the third count. He has contended that the defendant agreed to a rescission of the contract as to the waste yarns not shipped to him and that he is entitled to be paid the amount of money which stood to his credit on the books of the defendant as applicable in partial payment for the yarns to be shipped.

As we have above stated, the evidence does not show any such rescission agreed to by the defendant. The plaintiff argues, however, that the evidence proved that after the plaintiff had refused to pay any more money on the contract and demanded the payment to him of the above amount to his credit, the defendant sold 2000 pounds of the yarns that had been made ready for shipment but not shipped; and that this amounted to a rescission of the contract as to the yarns thus made ready.

The defendant denied that any such sale was made and the evidence was conflicting on that point, Sandler testifying

definitely that that sale was not from those yarns and another witness for the defendant testifying that he thought that it was from them. Under the circumstances we cannot hold that the trial justice erred in not finding that the contract was no longer binding on the plaintiff as to these yarns made ready for shipment but not shipped.

There is no evidence from which the trial justice was bound to find that the defendant was not continuously able, ready and willing to deliver these yarns to the plaintiff, if the latter would pay for them, which he refused to do.

There is a strenuous dispute between the parties whether, according to the law as applied to the facts of this case, the legal title to these particular waste yarns had passed from the defendant to the plaintiff; and cases and text-writers are cited on each side of this dispute. But we cannot see that it is necessary for us to decide the question thus raised, because we are of the opinion that it is immaterial to the decision of this case.

The trial justice on sufficient evidence found, expressly or by clear inference, that the defendant, after tendering to the plaintiff a delivery of the yarns which had been made ready for a third shipment, had continued to be able, ready and willing to deliver these yarns to the plaintiff; that the latter was and had remained in default by refusing to accept them and to pay the balance due from him in payment for them; and that therefore, being thus in default, he was not entitled, under the third count in his declaration, to recover the money which stood to his credit on the books of the defendant at the time of its tender of delivery.

We are of the opinion that this conclusion by the trial justice was correct. See *Hansbrough* v. *Peck*, 5 Wall. 497, at 506; *Lawrence* v. *Miller*, 86 N. Y. 131; *Tomboy Gold & Copper Co.* v. *Marks*, 185 Cal. 336, 197 P. 94; 2 Williston, Sales, 1502, § 599 j.

484

The plaintiff having failed to establish a right to recover on any count in his declaration, we are of the opinion that the final decision of the trial justice for the defendant must be sustained; and that the plaintiff's exception 1 should be overruled.

All of the exceptions relied upon by the plaintiff are overruled, and the case is remitted to the superior court for entry of judgment for the defendant upon the decision.

*John R. Higgins, Sidney Silverstein,* for plaintiff.

*Max Winograd, William J. Carlos,* for defendant.